PEÑA, J.
*413 INTRODUCTION
Defendant Dionicio Gutierrez-Salazar was charged, tried, and convicted by a jury of two murders for homicides committed in 2013 and 2015. As to the 2013 homicide, defendant was convicted of first degree murder on a felony-murder theory. Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), which became effective on January 1, 2019, amended the felony-murder rule in California. We asked the parties to brief what effect, if any, this amendment has on defendant's murder conviction relating to the 2013 homicide. In the meantime, several cases have held a defendant seeking relief under Senate Bill 1437 must do so by filing a petition in the court where the defendant was sentenced. (See People v. Martinez (2019) 31 Cal.App.5th 719, 727-729, 242 Cal.Rptr.3d 860 ; accord, *180 People v. Anthony (2019) 32 Cal.App.5th 1102, 1148-1153, 244 Cal.Rptr.3d 499 ; In re Taylor (2019) 34 Cal.App.5th 543, 246 Cal.Rptr.3d 342 ; see People v. Carter (2019) 34 Cal.App.5th 831 -835, 246 Cal.Rptr.3d 498.) In our appellate review of the record to consider this new law and its potential retroactive application to this case, we have discovered defendant is not entitled to relief under Senate Bill 1437. We therefore consider and deny relief on this appeal in the published part of this opinion. In doing so, we bypass the question of whether defendant must first comply with the petition procedure to apply for relief as unnecessary to our analysis under the circumstances of this case. *414 FACTUAL AND PROCEDURAL BACKGROUND
The trial court consolidated into one trial two murder charges alleged against defendant that were committed on different dates, one from 2013 (count 2), and one from 2015 (count 1). A jury convicted defendant of both counts of first degree murder ( Pen. Code, § 187, subd. (a) ; undesignated statutory references are to the Pen. Code). As to count 1, the jury found true a multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)), and a personal use of a deadly weapon enhancement allegation (§ 12022, subd. (b)(1)). As to count 2, the jury also found true a multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)), and a felony-murder allegation (§ 190, subd. (a)(17)) that the murder was committed during the commission of a robbery. Defendant challenges his convictions, arguing the trial court prejudicially erred by admitting evidence of his statements during both murders related to his involvement in a Mexican drug cartel; the trial court prejudicially erred by granting the prosecution's motion to consolidate the trial on the two murder counts; even if the trial court did not err in consolidating the trial, the consolidation resulted in "gross unfairness" to defendant, denying him his Fourteenth Amendment right to due process; and the cumulative effect of these errors resulted in a violation of his right to due process. In supplemental briefing, the parties also address the effect of Senate Bill 1437 on defendant's conviction on count 2.
A. February 2013 Murder (Count 2)
In February 2013, Teresa Jimenez was visiting her son in California. Ramon Jimenez, Teresa's husband from whom she was separated, lived nearby. Teresa testified she went to Ramon's house and he left to go to Delhi but said he would return shortly. About five minutes later, Teresa was eating in the kitchen when Ramon entered with three men. Teresa heard the men ask for money related to a loan. One of the men entered the kitchen with Ramon, and Ramon handed him a beer. Ramon took two more beers to the men in the living room. Ramon then went into the bedroom. According to Teresa, one of the men entered the kitchen and told Teresa to come with him. She followed him to the bedroom and he told her to sit on the bed. Teresa sat near Ramon who was also sitting on the bed. The man pulled out a gun and pointed it at Teresa and said they "didn't know who they were, like something or other from Michoacan." While pointing the gun at Teresa, he told Ramon: " 'Give it to me or I will kill your wife.' " Ramon told him "he had nothing." The man told Teresa to turn around; Teresa complied and put her head down. Teresa testified the man then shot Ramon, and Ramon fell on top of Teresa. Teresa never saw anyone come into the bedroom besides the man who shot Ramon. She testified the men started grabbing things and Teresa saw them take a briefcase. Once they left, Teresa *415 ran to tell her daughter-in-law Ramon *181 had been killed. They called the police. Teresa did not remember what the men looked like but she recalled the shooter was "the youngest of them all and the whitest of them all."
Police preserved the beer cans found at the scene and tested them for DNA. The DNA results led to the identification of Rogacino Munoz as a suspect. Munoz agreed to testify as part of his plea agreement. However, when the time came for him to testify, Munoz became reluctant. But he eventually agreed again to take the stand and testified he was afraid.
According to Munoz, he met defendant in 2012 when Munoz arrived from Mexico. A few months later, defendant asked Munoz to accompany him to pick up a payment and some receipts. In exchange, defendant was to get paid $3,000, and he told Munoz and Luis Perez they would each receive $1,000. They went to Ramon's house and saw Ramon in his van. Defendant went to talk to Ramon, followed him into the house, and told Munoz and Perez to come inside. They were all in the living room when defendant asked Ramon, " 'Are you going to give them to us in a good way?' " Ramon responded, " 'Or are you going to take them from me in a bad way?' " Ramon then went to retrieve beers and defendant grabbed the gun he had in his back pocket. Defendant said, " 'I'm going to kill them.' " Munoz recalled there was a lady in the kitchen eating. Defendant and Ramon walked into the bedroom and defendant came out again saying, " 'I'm going to kill them.' " Defendant told the woman in the kitchen to follow him to the bedroom.
Munoz followed defendant and the woman to the room where he saw Ramon sitting on the bed. The woman sat next to Ramon. Defendant again asked Ramon for the payments, and Ramon responded he could not find them. Defendant pointed the gun at the woman and told Ramon if he did not give him the receipts and money, he would kill her. He also said, " '[W]e're from the Familia Michoacana.' " Munoz testified he pushed defendant's gun down, said "No," and then told Ramon and the lady to turn around. According to Munoz, the lady turned first and, as Ramon started to turn, Ramon "tripped, like he was going to fall" and Munoz stopped him from falling. Defendant then shot Ramon in the head. Munoz walked out, turned back, and saw defendant, who looked calm. Munoz told Perez "[l]et's go" because defendant had killed the man; they went to the car. Munoz testified, when he and Perez were in the car, he realized the woman was still inside and he did not want defendant to kill her, so he went back inside. Defendant was on the phone when Munoz entered, and Munoz told him they should leave because the police would be coming. Munoz went back outside and defendant stayed in the room. Munoz again went back in and saw defendant rummaging through a dresser drawer and he noticed defendant had placed a briefcase outside of the room. Munoz again told defendant they needed to leave, but *416 defendant did not respond. Munoz went back to the car and defendant eventually exited the house with a briefcase, a blanket, $1,000, and a beer. According to Munoz, defendant "was singing when he came out." Defendant gave Munoz and Perez each $320 and told them he would give them the other $1,000 when he received it.
Officer Jose Sanchez interviewed defendant on September 8, 2015, in connection with the investigation of a 2015 murder. According to Sanchez, during that interview, defendant stated he was "present" during and "had also taken part in" Ramon's murder. He reported accompanying two other men, Munoz and Perez, to Ramon's house to collect money Ramon owed *182 Munoz. Defendant identified photographs of Munoz and Perez as the two men. When they arrived at Ramon's house, Ramon was in his van about to leave. They approached Ramon and he invited them inside. According to defendant, while inside the house, Perez and Munoz went to the bedroom with Ramon. Ramon's wife was in the kitchen and was also ordered to go to the bedroom. Defendant stated he heard a single gunshot, then "Perez ran out of the bedroom holding a revolver in his hand, and they fled the scene." They did not get any money but they took a black briefcase that contained documents. Police did not recover defendant's DNA from Ramon's house.
B. September 2015 Murder (Count 1)**
DISCUSSION
I.-III.***
IV. Senate Bill 1437
We requested supplemental briefing from the parties on the application and effect, if any, of Senate Bill 1437 on defendant's first degree murder conviction for Ramon Jimenez's 2013 murder.
A. Applicable Law
On September 30, 2018, while defendant's appeal was pending, the Governor signed Senate Bill 1437, which became effective on January 1, *417 2019. Senate Bill 1437 "amend[s] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amends sections 188, which defines malice, and 189, which defines the degrees of murder to address felony-murder liability, and it adds section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, §§ 2-4.)
Section 1170.95 permits those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts ...." (Id. , subd. (a).) An offender may file a petition under section 1170.95 where all three of the following conditions are met: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3).) A trial court receiving a petition under section 1170.95 "shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) If the petitioner has made such a showing, the trial court "shall issue an order to show cause." (Ibid. ) The trial court must then hold a hearing "to determine *183 whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously been [sic ] sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).)
"The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing. If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." (§ 1170.95, subd. (d)(2).) If a hearing is held, "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Id. , subd. (d)(3).) "[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Ibid. ) "If *418 the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (Ibid. )
B. Analysis
In his supplemental brief, defendant cites In re Estrada (1965) 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 ( Estrada ) to argue he is entitled to the ameliorative benefits of Senate Bill 1437 on direct appeal and that we must reverse his conviction for first degree murder on count 2 based on this new legislation. The People respond that though "Senate Bill No. 1437 applies retroactively to the judgment in this case ... the exclusive procedure for obtaining retroactive relief under Senate Bill No. 1437 is by filing a petition in superior court." They contend defendant "is not entitled to relief on direct appeal."
Our Supreme Court has held that when an "amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final ... it, and not the old statute in effect when the prohibited act was committed, applies," ( Estrada , supra , 63 Cal.2d at p. 744, 48 Cal.Rptr. 172, 408 P.2d 948 ; see id. at pp. 746-748, 48 Cal.Rptr. 172, 408 P.2d 948 ), unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent." ( People v. Nasalga (1996) 12 Cal.4th 784, 793, 50 Cal.Rptr.2d 88, 910 P.2d 1380.) In other words, if the Legislature does not clearly signal its intent that a statutory amendment that mitigates punishment should only apply prospectively, a defendant whose judgment is not final when the amended law goes into effect should be entitled to benefit from the ameliorative change in the law. (See Estrada , supra , 63 Cal.2d at pp. 744-745, 48 Cal.Rptr. 172, 408 P.2d 948.) This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the "former penalty was too severe" and therefore "must have intended that the new statute imposing the new lighter penalty ... should apply to every case to which it constitutionally could apply." ( Id. at p. 745, 48 Cal.Rptr. 172, 408 P.2d 948.)
At least three recent Court of Appeal decisions have held that Senate Bill 1437 is not silent on the question of retroactivity; rather, through the enactment of section 1170.95, it expressly provides a mechanism for defendants to petition for relief in the sentencing court. ( People v. Martinez , supra , 31 Cal.App.5th at pp. 727-729, 242 Cal.Rptr.3d 860 ; accord, *184 People v. Anthony , supra , 32 Cal.App.5th at p. 1153, 244 Cal.Rptr.3d 499 ; see People v. Carter , supra , 34 Cal.App.5th at p. 835, 246 Cal.Rptr.3d 498.) Accordingly, these courts held defendants cannot seek relief under Senate Bill 1437 on direct appeal but instead must file petitions in the court that sentenced them to obtain relief. ( People v. Martinez , supra , at pp. 727-729, 242 Cal.Rptr.3d 860 ; accord, People v. Anthony , supra , at pp. 1148-1153, 244 Cal.Rptr.3d 499 ; see People v. Carter , supra , 34 Cal.App.5th at p. 835, 246 Cal.Rptr.3d 498.) *419 We need not decide whether the same reasoning applies to preclude defendant from seeking relief on direct appeal in this case because, unlike in Estrada , the statutory changes resulting from Senate Bill 1437 do not benefit defendant such that it would lessen his punishment and entitle him to relief under the amended law. The jury was provided instructions allowing it to convict defendant of first degree murder as to the 2013 homicide pursuant to a felony-murder theory and the natural and probable consequences doctrine, as both were defined prior to the effective date of Senate Bill 1437. But the jury also found true a felony-murder special circumstance under section 190, subdivision (a)(17) with regard to the 2013 murder after being instructed:
"In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor or a member of a conspiracy, the People must prove either that the defendant intended to kill, or the People must prove all of the following:
"1. The defendant's participation in the crime began before or during the killing;
"2. The defendant was a major participant in the crime;
"AND
"3. When the defendant participated in the crime, he acted with reckless indifference to human life." ( CALCRIM No. 703.)
The language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes. (See In re Taylor , supra , 34 Cal.App.5th at p. 561.) Notably, defendant does not challenge the sufficiency of the evidence regarding the felony-murder special-circumstance finding. And because the jury found true the special circumstance allegation, any potential post-Senate Bill 1437 instructional error related to the felony-murder rule and the natural and probable consequences doctrine would be harmless beyond a reasonable doubt because the jury made the requisite findings necessary to sustain a felony-murder conviction under the amended law. Consequently, since defendant cannot benefit from a retroactive application of Senate Bill 1437, we need not resolve that issue, and instead we simply deny relief on this appeal. (See People v. Frazier (2005) 128 Cal.App.4th 807, 826, 27 Cal.Rptr.3d 336 ["Retroactive application of a defense is only required 'if its terms and the applicable facts permit, a defense to' defendant"]; see, e.g., id. at p. 827, 27 Cal.Rptr.3d 336 [defendant not entitled to new trial to assess impact of defenses under Compassionate Use Act because defenses under the act did not apply to him];
*420 People v. Cawkwell (2019) 34 Cal.App.5th 1048, 1053-1054, 246 Cal.Rptr.3d 744 [remand not appropriate despite change in law governing pretrial mental health diversion because record established defendant was not eligible for diversion under amended law based on nature of his convictions]; see generally People v. Coelho (2001) 89 Cal.App.4th 861, 889, 107 Cal.Rptr.2d 729 ["reviewing courts have consistently declined to remand cases where doing so would be an *185 idle act that exalts form over substance because it is not reasonably probable the court would impose a different sentence"].) Nevertheless, nothing in this opinion should be construed as limiting defendant's right to file a petition in the trial court pursuant to section 1170.95. Any available relief, of course, may be constrained by the doctrine of the law of the case. ( People v. Stanley (1995) 10 Cal.4th 764, 786, 42 Cal.Rptr.2d 543, 897 P.2d 481.)
DISPOSITION
The judgment is affirmed.
WE CONCUR:
POOCHIGIAN, Acting P.J.
DESANTOS, J.

See footnote *, ante .

See footnote *, ante .